THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH MILEWSKI, Plaintiff in Error.

*Opinion filed February 17, 1925—Rehearing denied April 15, 1925.*

CRIMINAL LAW—*when improper argument of State's attorney cannot be said to have been prejudicial.* In a prosecution for murder, the use of improper argument by the State's attorney cannot be regarded as having prejudiced the jury in their verdict where the extreme penalty is not imposed and where the proof of the guilt of the defendant is conclusive and shows the crime to have been atrocious.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE FRED RUSH, Judge, presiding.

WM. SCOTT STEWART, W. W. O'BRIEN, and CHARLES P. R. MACAULAY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, HENRY T. CHACE, JR., and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error (hereafter called defendant) was convicted in the criminal court of Cook county of murdering his wife and was sentenced to the penitentiary for life. No one saw the crime committed. It is conceded defendant's wife was murdered December 13, 1923, in the basement of the house in which she lived with her husband and small child. Defendant did not testify and offered no evidence in his defense, but he denied to the officers, when taken in custody, that he committed the crime. About 8:30 or 9:00 o'clock the evening of December 13 some persons observed smoke issuing from the garage, and later screams

were heard from the house, which sounded like a woman calling for help and saying she was being killed. Some of the parties who saw the smoke from the garage tried to get into the building. While they were doing so defendant came down-stairs, went into the garage and shut off the motor of the car therein, which was racing. A woman asked him what the trouble was, and he said his wife left the motor running. This he said before the screams were heard. The screams were about ten minutes after defendant went back into the house and came from somewhere inside the building. Defendant's wife had an arrangement to meet her sister that evening, who lived with defendant's family, but the wife did not keep the appointment. The sister-in-law, Louise Tirunas, testified that on coming home, about midnight, she found the door to the living apartment locked, and knocked. Defendant came to the door in his night clothes and opened it. When she asked for the wife defendant said he did not know where she was; that he thought she had gone to a show, and also said she did not feel good and maybe went to see her friends. The witness said the radiator was very hot, and she spoke of it. Defendant went down-stairs, where he remained about ten minutes, and later the witness heard him walking in the house. He got up about six o'clock and went down-stairs again. The witness got up about 6:30 and saw defendant going out of the back door and through the yard to the garage. He came back in a minute and said that his wife was dead in the garage. The witness said, "Joe, you killed Josie!" Defendant replied, "No! No! Louise! You know how nicely we lived." He then called the police about seven o'clock.

It is unnecessary to detail the evidence. The theory of the State, which we think very reasonable, is that defendant's wife had gone to the garage and for some reason had left the motor running. When his attention was called to it by people on the street he went to the garage, shut the

motor off and went back into the basement. It was very soon after this that the screams were heard and it was then the murder was committed. The body was dragged from the basement out to the garage and left a trail of human blood. The blood also left a trail up the stairs, and on the door-knob to defendant's apartment there was blood. The basement was wet and had the appearance of having had water on it in an attempt to clean it. A slipper was on one foot of the deceased and the other slipper was found in the back yard, between the house and the garage. The furnace was dumped by the officers and the ashes sifted, and the metal part of a knife, a bunch of keys, a piece of fur and one or two buttons were found. In the coal pile was a broken seltzer bottle, which had human blood and human hair on it. A woman's glove was also found on the coal pile and it was bloody. Deceased's skull had been broken, the scalp was torn, and a long cut extended from the forehead to the right ear, which was made by a knife or sharp instrument, and the knife passed through the windpipe on the left side of the neck. These wounds caused her death.

There is no testimony of defendant and his wife having any difficulty at the time of the murder, but the proof is that they did quarrel about money matters occasionally and had had a quarrel about three days before the murder.

There was fresh coal on top of the fire in the furnace when the officers came, a pillow or bag of feathers, and between the coal and the feathers were newspapers. They were taken out and there was blood on the pillow, also on the papers.

The defendant says in his brief the evidence pointed to his guilt but there were omissions in the proof indicating that some unknown party was guilty of the murder and that defendant could not have committed it. We think the evidence certainly points to the guilt of defendant very strongly, and to the improbability, if not absolute impossibility, that the murder could have been committed by any-

one else.   The fact that defendant had no blood on him when the officers arrived or that the knife was not proven to have been his we consider of little importance in view of the impelling force of the testimony.   Indeed, it is difficult to imagine how any other verdict than one of guilt could have been returned.

No complaint is made of any of the court's rulings on the testimony or in giving or refusing instructions, but it is contended the assistant State's attorney in his opening argument to the jury used improper and prejudicial language.   A short excerpt from the argument is in the abstract.   The evidence shows defendant was in bed with his three-year-old female child when his sister-in-law came home at midnight and woke him up.   The State's attorney referred to this, and said, substantially, that it was not difficult to understand defendant was capable of anything.   Counsel for defendant objected and the court overruled the objection.   The State's attorney then said he did not mean that defendant had acted improperly with his little daughter, but the meaning he intended to convey was that it was not possible to conceive what a man so devoid of conscience as defendant might or might not do.   It is possible the language used by the State's attorney might have been misconstrued by the jury, but not probable.   We have repeatedly cautioned State's attorneys against using language not justified by the record, but in this case the proof of guilt was so conclusive that the language of the State's attorney could not have prejudiced the defendant, and this is shown, we think, conclusively by the punishment inflicted.

The judgment is affirmed.          *Judgment affirmed.*